**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. 20-288** |
| **MANUEL MOLINA-GARCIA** | |

**MEMORANDUM OPINION**

**Rufe, J.**                                                               **June 13, 2022**

Defendant Miguel Molina-Garcia is charged with one count of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). Defendant has filed a Motion to Dismiss Indictment on Constitutional Speedy Trial Grounds, arguing that the 19 months that elapsed between his sealed indictment and his arrest (and the 21 months between his sealed indictment and the scheduled trial date) violates his rights under the Sixth Amendment to a speedy trial.[1]

Upon consideration of Defendant's motion, the Government's response thereto, and the evidence, testimony, and oral arguments presented at an evidentiary hearing, the Court now enters its findings of fact and conclusions of law.

**I.     FINDINGS OF FACT**

**A.  The Pennsylvania Firearms Prosecution**

1. In March of 2019, Defendant was released from the custody of the City of Philadelphia after receiving a sentence of time served to immediate parole. Due to administrative errors within the Philadelphia division of parole, however, he was not assigned a parole officer and no parolee file was opened under his name.[2]

---

[1] Def.'s Mem. L. Supp. Mot. Dismiss [Doc. No. 21] at 1.

[2] Tr. June 6, 2022 at 49–50.

2.  On October 9, 2019, Defendant's car was stopped by officers of the Philadelphia Police Department ("PPD") in the parking lot of a Philadelphia bar after officers responded to a reported altercation inside of the bar. During the stop, a gun was recovered, and Defendant was taken into custody.[3] At arrest, Defendant identified himself as Fernando Correa Vincenty.[4]

3.  Defendant was charged with violations of the Pennsylvania Firearms Act (collectively, the "Pennsylvania firearms charges") and held by the City of Philadelphia in pretrial detention until January 30, 2020, when $5,000 cash bail was posted on Defendant's behalf.[5]

4.  Defendant's criminal case in the Philadelphia County Court of Common Pleas was continued several times during the COVID-19 pandemic. A motions hearing was scheduled for October 19, 2020. An entry on the Philadelphia court docket indicates that a subpoena for this date was "mailed to [D]efendant's last known address."[6] The internally maintained docket of the Philadelphia court, which has been entered into evidence, also shows the address Defendant provided to the Philadelphia court: 3124 Boudinot Street, Philadelphia, Pennsylvania.[7]

5.  After Defendant did not appear at the October 19, 2020 motions hearing his bail was revoked and forfeited, and a bench warrant was issued for his arrest.[8]

_____

[3] *See* Gov't Exs. 28 and 29 (body camera footage from Officers Sinabria and Babcock of the PPD, showing the officers' stop of Defendant and the recovery of a firearm).

[4] Gov't Ex. 5 (Philadelphia Police Department Form 75-48A Investigation Report).

[5] Gov't Ex. 27 at 2 (Philadelphia County Court of Common Pleas public docket entries indicating charges against Defendant, that Defendant's bail was set at 10% of 50,000, and that bail was posted on January 30, 2020).

[6] *See* Gov't Ex. 1 at 9 (Philadelphia County Court of Common Pleas public docket entries indicating Defendant's bail forfeiture).

[7] Gov't Ex. 1 at 3.

[8] Gov't Ex. 1 at 9; Gov't Ex. 27 at 4 (docket entries indicating Defendant's failure to appear, and reflecting the orders revoking Defendant's bail and issuing a bench warrant).

**B.  ICE Interaction, Federal Indictment, and HSI Investigation**

6.  In July of 2018, Officer Thomas Darmody, a deportation officer with Immigration and Customs Enforcement in Philadelphia, conducted a field interview of Defendant to determine his alienage and removability.[9] Officer Darmody testified that, at that time, Defendant claimed to be a citizen national of the Dominican Republic, without legal authorization to be present in the United States.[10]

7.  By September 2020, Defendant's file was assigned to Special Agent Joshua Mitnick of Homeland Security Investigations ("HSI"). Special Agent Mitnick became involved in the federal adoption of, and subsequent federal indictment relating to, Defendant's alleged firearms offenses.[11]

8.  On September 3, 2020, a federal grand jury issued a sealed indictment charging Defendant with one count of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). The charge in the indictment relates to the same firearm possession underlying Defendant's October 9, 2019 arrest by PPD officers. On September 4, 2020, a federal bench warrant for Defendant's arrest was issued by United States Magistrate Judge Richard Lloret.[12]

9.  After the federal warrant issued, Special Agent Mitnick conducted a basic background investigation of Defendant. This investigation included reviewing local paperwork related to the Pennsylvania firearms charges and the related investigation. This investigation also included searches in JNET (a Pennsylvania criminal justice database that includes licenses

---

[9] Tr. June 2, 2022 at 27–28.

[10] Tr. June 2, 2022 at 28.

[11] Tr. June 2, 2022 at 29–30.

[12] Sealed Indictment [Doc. No. 1]; Motion and Order for Issuance of Bench Warrant [Doc. No. 2].

and PennDOT information), criminal history checks, and a review of DHS databases for immigration information related to Defendant.[13]

10. During this search Special Agent Mitnick identified that Defendant possessed a Pennsylvania driver's license. This license bore a picture of Defendant, appeared to match Defendant's physical characteristics, and listed an address of 3124 Boudinot Street, Philadelphia, Pennsylvania.[14] However, the license had the birth date and name of Fernando Correa Vincenty, otherwise unknown to Special Agent Mitnick. Special Agent Mitnick contacted police in Puerto Rico, who provided him with a picture and biographic data of the real Fernando Correa Vincenty.[15]

11. To obtain a Pennsylvania driver's license under someone else's name, a person would generally have to present a birth certificate and Social Security card associated with that name.[16]

12. Special Agent Mitnick and a team of officers from Enforcement Removal Operations ("ERO") made plans to arrest Defendant at his upcoming Philadelphia Court of Common Pleas court date on October 19, 2020.[17]

13. Following Defendant's failure to appear at the October 19 state court hearing, Special Agent Mitnick entered the federal warrant for Defendant's arrest into the National Crime

---

[13] Tr. June 2, 2022 at 31–33.

[14] Tr. June 2, 2022 at 37–40; Gov't Ex. 6 (JNET information relating to the driver's license in question).

[15] Tr. June 2, 2022 at 42.

[16] Tr. June 2, 2022 at 37.

[17] Tr. June 2, 2022 at 31, 89, 120.

Information Center ("NCIC") on October 20, 2020.[18] Special Agent Mitnick then initiated a field search for Defendant.

14. Special Agent Mitnick identified four vehicles and three Philadelphia addresses associated with Defendant's alias and false identification: a Honda Accord and a Toyota Corolla both registered to the 3124 Boudinot Street address,[19] a Mazda truck registered at 2930 Elbridge Street,[20] and another vehicle registered at 1210 East Venango Street.[21]

15. Between the fall of 2020 and the early summer of 2021, Special Agent Mitnick conducted physical surveillance of each of the addresses associated with Defendant. Special Agent Mitnick conducted physical surveillance in 1- to 4-hour blocks between 6:00 AM and 5:00 PM. He personally surveilled each address on at least three occasions. Special Agent Mitnick did not encounter Defendant during this surveillance, but repeatedly saw one of the vehicles associated with him—the Mazda truck registered at 2930 Elbridge Street.[22]

16. Special Agent Mitnick also conducted surveillance of the four vehicles registered under Defendant's alias. Special Agent Mitnick entered the license plate number of each vehicle into a License Plate Reader ("LPR") system, an integrated system of stationary and mobile sensors that scans and documents license plates that pass each sensor.[23] Special Agent Mitnick has successfully relied on the LPR system to find fugitives in previous cases.[24]

---

[18] Tr. June 2, 2022 at 81–83.

[19] Gov't Exs. 7 and 8 (PennDOT registration records).

[20] Tr. June 2, 2022 at 51, 53; Gov't Ex. 9 (PennDOT registration records).

[21] Gov't Ex. 10 (PennDOT registration records). This record documents the "make" of this car as "CAM."

[22] Gov't Ex. 9.

[23] Tr. June 2, 2022 at 59–60.

[24] Tr. June 2, 2022 at 60.

17. Special Agent Mitnick ran repeated queries of the LPR system. When the LPR system identified one of Defendant's cars, Special Agent Mitnick would travel to the area where the car was sighted and look for the vehicle.[25] Two vehicles received multiple hits in the LPR system and were the subject of repeated surveillance attempts by Special Agent Mitnick. One of the vehicles, the Mazda truck, was repeatedly located on the 2900 block of Elbridge Street, where it was registered, and was moved infrequently.[26] The other, the Honda Accord in which Defendant was arrested on October 9, 2019, was spotted at least 15 times by the LPR system at various locations throughout Philadelphia. Special Agent Mitnick focused his efforts on the Honda Accord, as Defendant was first arrested in that car and it was being actively used in Philadelphia. However, the Honda Accord was never located.[27]

18. Throughout his investigation Special Agent Mitnick ran repeated searches for Defendant under both his real name and his alias on various databases and record aggregators, including JNET, Clear, and Accurint.[28] Special Agent Mitnick also ran periodic searches of Department of Labor records for the Social Security number associated with the real Fernando Correa Vincenty, to determine if Defendant was working in Pennsylvania under that identity. No Pennsylvania labor records were associated with that Social Security number.[29]

19. On at least three occasions, Special Agent Mitnick also conducted physical surveillance at the address of Jennifer Silvestre, a known associate of Defendant who was driving

---

[25] Tr. June 2, 2022 at 60–62.

[26] Tr. June 2, 2022 at 61–62.

[27] Tr. June 2, 2022 at 63–64.

[28] Tr. June 2, 2022 at 67, 98–99, 109–10.

[29] Tr. June 2, 2022 at 68–69.

Defendant's Honda Accord when he was arrested on October 9, 2019. ERO Officers conducted additional visits to that address.[30] Special Agent Mitnick did not find Ms. Silvestre, or any woman, at the address.[31] Special Agent Mitnick ran searches for Ms. Silvestre in JNET, but did not find any Pennsylvania JNET record of her and did not conduct a broader search for her.[32]

20. After Defendant's arrest on the federal indictment, an investigator from the Federal Community Defender's Office working on Defendant's behalf was able to locate and interview Ms. Silvestre within the span of a few days. This investigator found Ms. Silvestre through information gleaned from social media, court filings related to a landlord-tenant dispute, and a subsequent interview with Ms. Silvestre's mother, who was also a party to the landlord-tenant dispute.[33]

21. During the HSI investigation, Special Agent Mitnick did not communicate with Philadelphia County Adult Probation and Parole to develop new leads, despite his knowledge of Defendant's prior arrest record.[34]

22. No evidence was introduced that Special Agent Mitnick attempted to identify or interview associates of Defendant, excluding his surveillance of Jennifer Silvestre's last known address.

---

[30] Tr. June 2, 2022 at 54, 58, 94–95.

[31] Tr. June 2, 2022 at 58, 95.

[32] Tr. June 2, 2022 at 95–97.

[33] Tr. June 6, 2022 at 70–71.

[34] Tr. June 2, 2022 at 88–89.

7

23. By the fall of 2021, based on his failure to find Defendant at the location of any of his vehicles and a lack of new LPR hits on the Honda Accord, Special Agent Mitnick concluded that Defendant had likely stopped using the identified vehicles.[35] He spoke to supervisors within HSI about how to proceed with the case, and they determined that the case might be referred to the United States Marshals Service for additional investigation.[36] Referral was first discussed with the Marshals Service in late 2021, and the case was referred in early 2022.[37]

### C. U.S. Marshals Service Investigation

24. In January of 2022, Defendant's case was referred to the Fugitive Unit of the United States Marshals Service, a law enforcement agency specially trained in, among other things, the location and apprehension of fugitives.[38]

25. United States Marshals receive training in using certain sensitive investigative techniques to locate and apprehend fugitives. In this case, the Marshals developed information and used a sensitive investigative technique that the Marshals involved were trained to use and had experience using.[39]

26. The application of this technique took several weeks[40] and required the Marshals to apply for an order from a federal magistrate judge.[41]

---

[35] Tr. June 2, 2022 at 66–67, 69–70.

[36] Tr. June 2, 2022 at 69–70.

[37] Tr. June 2, 2022 at 70.

[38] Tr. June 6, 2022 at 6; Tr. June 8, 2022 at 3–4.

[39] Tr. June 8, 2022 at 4.

[40] Tr. June 6, 2022 at 11.

[41] Tr. June 6, 2022 at 37–38.

27. The technique used by the Marshals would have been available to HSI Special Agent Mitnick when he was trying to locate Defendant; however, Special Agent Mitnick is not trained in or experienced with using that technique, and does not use it in the regular course of his duties as an HSI agent.[42]

28. Using this sensitive investigative technique, the Marshals identified a potential location for Defendant: a rowhouse at 6938 Lynford Street, Philadelphia.[43] This address was not otherwise known to government agents or associated with Defendant.[44]

29. On the morning of March 31, 2022, the Marshals went to the identified Lynford Street address to arrest Defendant. An armed and uniformed entry team knocked on the door of the Lynford Street address, loudly and repeatedly announcing themselves as police with a warrant.[45]

30. Shortly after the first announcement, the entry team communicated on the group's shared radio system that Defendant was spotted first at the front window of the building, then shortly thereafter at the back door where more agents were stationed, and then again at the front window.[46] Deputy Marshal Christopher Berdos, who was leading the entry team, called for a forced entry of the house, and the entry team broke down the door.[47]

---

[42] Tr. June 8, 2022 at 4.

[43] Tr. June 6, 2022 at 11, 14.

[44] Tr. June 6, 2022 at 11.

[45] Tr. June 6, 2022 at 14–16.

[46] Tr. June 6, 2022 at 16–18.

[47] Tr. June 6, 2022 at 19–20.

31. After the Marshals broke down the door they arrested Defendant, conducted a "minimal protective sweep" of first-floor areas accessible to Defendant, and left.[48] The entire encounter, between the time that the Marshals reached the property and the time they left, took less than ten minutes.[49]

32. Defendant's initial appearance in federal court was on April 1, 2022.

33. The Indictment was unsealed on April 4, 2022, and Defendant was arraigned on April 6, 2022.

34. On April 8, 2022, the Court scheduled the trial to begin on June 13, 2022.[50]

35. Defendant filed the Motion on May 13, 2022, and the Court held the hearing on June 2, June 6, and June 8, 2022.

### D.  Defendant's Activities Between Federal Indictment and Federal Arrest

36. Defendant and Alondra Estrella Germonsen lived together as husband and wife for a period until their separation in 2017.[51] During this period, Ms. Estrella lived at 3124 Boudinot Street, Philadelphia, and Defendant lived alternately between that address and his mother's house elsewhere in Philadelphia.[52] After his separation from Ms. Estrella Defendant continued to receive mail at the Boudinot Street address, but no longer lived there.[53]

_____

[48] Tr. June 6, 2022 at 20–21, 23–24.

[49] Tr. June 6, 2022 at 27.

[50] Order April 8, 2022 [Doc. No. 13].

[51] Tr. June 6, 2022 at 78–79.

[52] Tr. June 6, 2022 at 84. Evidence has not been introduced as to the exact address of Defendant's mother's house, but Ms. Estrella testified that she believed it was located on either East or West Allegheny Avenue—both streets in Philadelphia. Tr. June 6, 2022 at 85.

[53] Tr. June 6, 2022 at 92–93.

37. Defendant has a young daughter with Ms. Estrella. Since Defendant's separation from Ms. Estrella in 2017, Defendant has visited his daughter weekly, typically on weekends, at a house on the 2700 block of Elbridge Street, Philadelphia.[54] He continued these visits between his release from Philadelphia's custody after posting bail on the Pennsylvania firearms charges in January 2020 and his arrest by the Marshals in March 2022.[55]

38. During these visits, Ms. Estrella would give Defendant mail that had arrived for him at the Boudinot Street address. Ms. Estrella never saw mail for Defendant from any court system delivered to that address.[56]

39. Defendant consistently communicated with Ms. Estrella from a single phone number.[57] Ms. Estrella did not know where Defendant was living between his pretrial release on the Pennsylvania firearms charges and his federal arrest.[58]

## II.   DISCUSSION

As Defendant does not claim that his rights under the Speedy Trial Act have been violated, the federal statutory standards for speedy trial are not implicated by Defendant's motion. Instead, Defendant relies upon his constitutional Sixth Amendment right to a speedy trial.[59]

---

[54] Tr. June 6, 2022 at 79.

[55] Tr. June 6, 2022 at 79.

[56] Tr. June 6, 2022 at 81–82.

[57] Tr. June 6, 2022 at 90–91.

[58] Tr. June 6, 2022 at 89–90.

[59] Def.'s Mem. L. Supp. Mot. Dismiss [Doc. No. 21] at 1, 4–5.

In *Barker v. Wingo*, the Supreme Court "established a four-factor test for evaluating whether the constitutional right to a speedy trial has been violated."[60] "The inquiry focuses on: (1) the length of the delay before trial; (2) the reason for the delay and, specifically, whether the government or the defendant is more to blame; (3) the extent to which the defendant asserted his speedy trial right; and (4) the prejudice suffered by the defendant."[61] "All factors must be considered and weighed as no one factor is dispositive nor 'talismanic.'"[62] This analysis is "intensely fact-bound."[63] The *Barker* factors may be triggered by sufficiently long delays between "indictment and arrest."[64]

### A.  Length of Delay

In this case, the parties measure the length of pre-trial delay from the indictment to the scheduled trial date. "[P]ostaccusation delay" generally triggers a speedy trial inquiry if more than a year has elapsed between indictment and trial.[65] The parties agree, and this Court finds, that the 21-month delay between Defendant's indictment and scheduled trial date (and the 19-month delay between Defendant's indictment and arrest) is long enough to require analysis of the other *Barker* factors.[66]

---

[60] *United States v. Velazquez*, 749 F.3d 161, 174 (3d Cir. 2014) (citing *Barker v. Wingo*, 407 U.S. 514 at 530–31 (1972)).

[61] *Id.*

[62] *Hakeem v. Beyer*, 990 F.2d 750, 759 (3d Cir. 1993) (quoting *Barker*, 407 U.S. at 533).

[63] *Velazquez*, 749 F.3d at 181 n.18 (citing *Barker*, 407 U.S. at 530).

[64] *Doggett v. United States*, 505 U.S. 647, 652 (1992).

[65] *Id.* at 652 n.1.

[66] Def.'s Mem. L. Supp. Mot. Dismiss [Doc. No. 21] at 6; Gov't Resp. Opp'n [Doc. No. 25] at 7.

After determining that a full *Barker* analysis is warranted by a pretrial delay, the Court must then weigh the length of delay alongside the other factors.[67] As a general principle, "the presumption that pretrial delay has prejudiced the accused intensifies over time."[68] For this reason, the Court will factor in the length of delay in its analysis of prejudice below.

**B.  Reason for Delay**

The Court must evaluate who is more at fault for the delay. In cases where a defendant cannot be found post-indictment, courts assess (1) whether the Defendant intentionally evaded prosecution and (2) whether the government reasonably exercised its due diligence to locate the defendant.[69] Ultimately, "[t]he government bears the burden of justifying the delay in bringing a defendant to trial."[70]

*1.  Defendant's Conduct: Intentional Evasion Inquiry*

Issues of intentional evasion in the speedy trial context have not been addressed in detail in the Third Circuit. Although it is not a defendant's responsibility to contact the government during an investigation., a finding of intentional evasion on the part of the defendant may preclude relief, and significant "changes in behavior" after an indictment may be relevant if they "could be attributed to a deliberate effort . . . to evade detection."[71]

---

[67] *Doggett*, 505 U.S. at 651.

[68] *Id.*

[69] *See Velazquez*, 749 F.3d at 178–81 (assessing both a defendant's conduct and the government's diligence in searching for him).

[70] *United States v. Claxton*, 766 F.3d 280, 294 (3d Cir. 2014) (citing *United States v. Battis*, 589 F.3d 673, 680 (3d. Cir. 2009).

[71] *Velazquez*, 749 F.3d at 179 (citations omitted).

Little evidence of Defendant's conduct during the 19-month gap between his indictment and his arrest has been presented. Alondra Estrella Germonsen, the mother of Defendant's daughter, testified that Defendant visited his daughter in Philadelphia on most weekends during this period, as he had since Defendant's separation from Ms. Estrella in 2017. The Court can infer from this that Defendant was frequently in Philadelphia and maintained at least some of his pre-arrest habits. The government argues, and Defendant does not dispute, that Defendant maintained the use of his false identification during this period.[72] It is also undisputed that Defendant did not appear for his Philadelphia County Court of Common Pleas proceedings or claim the bail money that was forfeited after he failed to appear at the October 19, 2020 hearing.[73]

Defendant argues that he failed to appear for the Philadelphia hearing due to his mistaken belief that the Pennsylvania firearms charges were dismissed because of the COVID-19 pandemic.[74] The Court grants little weight to Defendant's argument, which is unsupported by testimony or other evidence. Although it has not been shown that Defendant received the October 2020 subpoena, the failure to receive a specific subpoena on a specific date does not suggest the dismissal of Defendant's case. Defendant had multiple avenues to inquire as to the status of his prosecution, including by reviewing the public docket for the Court of Common Pleas or contacting his assigned attorney. Further, the $5,000 bail posted on his behalf gave him every incentive to conduct such an inquiry.

---

[72] *See* Tr. June 8, 2022 at 32.

[73] *See* Gov't Ex. 27 at 4 (Philadelphia County Court of Common Pleas public docket entries indicating Defendant's bail forfeiture).

[74] Def.'s Mem. L. Supp. Mot. Dismiss [Doc. No. 21] at 7.

In contrast, the Court grants significant weight to the fact that Defendant did not return to court even after the $5,000 posted for Defendant's bail was forfeited, that Defendant had obscured his location through use of an alias and false identification, and that Defendant was ultimately located and arrested at an address completely unassociated with either his alias or his given name.[75] In addition, the Court credits the testimony of Deputy Marshal Berdos that Defendant attempted to flee from his March 31, 2022 arrest.[76] This attempted flight contributes to the Court's conclusion that Defendant was intentionally avoiding arrest. Where a defendant flees after posting bail on state charges, fails to make "any subsequent court appearances on the state charges,"[77] and uses multiple identities, these circumstances "mak[e] his evasiveness obvious."[78] Given the confluence of factors in this fact-specific analysis, the Court finds that Defendant's arrest was delayed, in significant part, because of his intentional efforts to make it difficult for law enforcement agents to find him.

### 2.   Government's Conduct: Reasonable Diligence Inquiry

The Court next must determine whether the government exercised reasonable diligence in locating Defendant.[79] If the government acts with reasonable diligence in its efforts to locate a defendant, the "speedy trial claim [will] fail . . . however great the delay, so long as [the

---

[75] The Third Circuit has cautioned against focusing on the "type of life a suspect leads" or a suspect's "transient" lifestyle when conducting a speedy arrest analysis. *Velazquez*, 749 F.3d at 180. However, a change in a wanted defendant's living arrangements, when combined with the use of false identification and other evasive behavior, can obviously reflect an attempt to elude police.

[76] Tr. June 8, 2022 at 44–45.

[77] *United States v. Walker*, 92 F.3d 714, 715 (8th Cir. 1996).

[78] *Velazquez*, 749 F.3d 161 at 181 n.18 (citing *Walker*, 92 F.3d at 715–16) ("The defendant in *Walker* . . . had fled after posting bail on state drug charges, and was on the run at the time he was indicted for federal drug charges. He also used a false identity, making his evasiveness obvious.").

[79] *Doggett*, 505 U.S. at 656.

defendant] [can] not show specific prejudice to his defense."[80] If the government acts with bad faith in its efforts to pursue a defendant, relief is "virtually automatic."[81] Between these two standards lies negligence.[82] "If 'the defendant is not attempting to avoid detection and the government makes no serious effort to find him, the government is considered negligent in its pursuit.'"[83] The government's negligence "weighs against the government, albeit 'less heavily' than a deliberate or bad-faith delay."[84]

An inquiry into post-indictment attempts to arrest a defendant must focus on whether the government has "diligently used the information available to it."[85] This evaluation turns, in part, on the actual difficulty of locating the missing defendant. The government will generally be found diligent if it "promptly acted upon information it obtained in the course of its investigation."[86]

Special Agent Mitnick conducted extensive digital and physical surveillance of addresses and vehicles that were known to be associated with Defendant. When an LPR system identified the location of one of Defendant's vehicles, Special Agent Mitnick promptly followed up on those leads with attempted physical surveillance of the locations identified by the LPR. Special Agent Mitnick also monitored a broad array of databases for Defendant's known aliases. When these strategies proved ineffective, in part because of Defendant's intentional efforts to obscure

---

[80] *Id.*

[81] *Doggett*, 505 U.S. at 656–57; *see Velazquez*, 749 F.3d at 175.

[82] *Velazquez*, 749 F.3d at 175 (citing *Barker*, 407 U.S. at 531).

[83] *Velazquez*, 749 F.3d at 180 (quoting *United States v. Mendoza*, 530 F.3d 758, 763 (9th Cir. 2008)).

[84] *Velazquez*, 749 F.3d at 175 (quoting *Barker*, 407 U.S. at 531).

[85] *Velazquez*, 749 F.3d at 180.

[86] *Claxton*, 766 F.3d at 295.

16

his identity, Special Agent Mitnick contacted an agency with specialized skill and resources to develop more leads. It is relevant that, unlike in many cases involving a pretrial delay, Defendant was found and arrested as the result of significant and intentional investigation by the Marshals.[87]

Defendant argues that there were multiple avenues of investigation available to Special Agent Mitnick that might have allowed him to develop new leads, including physical canvassing of potential witnesses in neighborhoods associated with Defendant.[88] However, the Court cannot conclude from this that the government "made no serious efforts" to find Defendant.[89] "Although the government must make some effort to locate a fugitive defendant, and bring him to trial, that effort need only be reasonable and not heroic or herculean."[90] While Special Agent Mitnick's efforts to find Defendant were unavailing, they were extensive and time-consuming, and included far more than the passive database monitoring that has previously been condemned by the Third Circuit.[91] With the benefit of hindsight one could conclude that different investigative

---

[87] *See id.* at 297 (holding that when the defendant is found as the result of intentional police work, rather than fortuitously, this weighs in favor of the government).

[88] Tr. June 8, 2022 at 23–24.

[89] *Doggett*, 505 U.S. at 652–53 (finding the government negligent where, "[f]or six years, the Government's investigators made no serious effort to test their progressively more questionable assumption that [the defendant] was living abroad, and, had they done so, they could have found him within minutes.").

[90] *United States v. Clark*, No. 97-669, 2005 WL 2178913, at *7 (E.D. Pa. Sept. 8, 2005) (citation omitted).

[91] *Compare Velazquez*, 749 F.3d at 180 (finding negligence where "[t]he sum total of [the government's] activity [for five years of its pursuit] was limited to checking the NCIC eight times and, perhaps, placing [the defendant] on the 'Most Wanted' list for the Philadelphia DEA office") with *United States v. Ramos*, 264 F. App'x 57, 60 (2d Cir. 2008) ("While the government could have taken additional steps to pursue [a defendant]," government agents were not negligent in their pursuit even though they "failed to notify the New York Department of Motor Vehicles and immigration authorities about his arrest warrant, failed to seek his extradition from the Dominican Republic, and failed to interview his family and neighbors, including his building's superintendent," but instead interviewed some associates of the defendant, conducted regular surveillance of known addresses, and promptly pursued the defendant once his location became known).

techniques or strategies may have enabled the government to locate Defendant earlier, but the government did not negligently ignore available leads.

The Court finds that, in light of Defendant's intentional evasion of arrest, and viewing the government's investigation holistically, the government acted with reasonable diligence in its pursuit of Defendant following his indictment.

### C.  Assertion of Speedy Trial Right

*Barker* also requires the Court to examine "[w]hether and how a defendant asserts his [speedy-trial] right[] including 'the frequency and force' of such assertions."[92] When a defendant is at large, this factor heavily turns on whether the defendant knew about the pending indictment.[93] Here, the federal indictment was sealed, and there is no evidence that Defendant was aware of the federal charges against him until he was arrested on March 31, 2022. Counsel for Defendant first entered her appearance on April 4, 2022, and Defendant's speedy trial motion was filed approximately six weeks later, a month before the scheduled trial date.[94]

The government correctly notes that a motion for speedy trial, alone, "does not establish that [a defendant has] appropriately asserted their [speedy trial] rights."[95] Instead, any assertions "must be viewed in the light of [the defendant's] other conduct."[96] The government argues that Defendant failed to assert his speedy trial rights in the Pennsylvania firearms charges based on the same underlying conduct, and the Court should weigh this failure in assessing whether

---

[92] *Velazquez*, 749 F.3d at 181–82 (citing *Barker*, 407 U.S. at 531 and 529).

[93] *Velazquez*, 749 F.3d at 182 (citing *Doggett*, 505 U.S. at 653).

[94] Not. Attorney Appearance [Doc. No. 7]; Def's Mot. Dismiss [Doc. No. 21].

[95] *United States v. Loud Hawk*, 474 U.S. 302, 314 (1986).

[96] *Id*.

Defendant has appropriately asserted his Sixth Amendment rights.[97] However, in *United States v. Loud Hawk*, the case the government cites for this proposition, the defendant "consumed six months by filing indisputably frivolous petitions for rehearing and for certiorari" and "filled the District Court's docket with repetitive and unsuccessful motions."[98] This behavior clearly and directly affected the timing of the criminal prosecution at issue in *Loud Hawk*. Here, the government asks the Court to consider Defendant's purported failure to assert speedy trial rights in separate (albeit related) criminal proceedings in state court. The government has not offered, and the Court has not found, any authority suggesting that Defendant's right to a speedy trial before this Court is diminished under such circumstances. The Court finds that Defendant promptly asserted his speedy trial right in response to his federal prosecution.

### D.  Prejudice Suffered by Defendant

Finally, the Court must evaluate whether Defendant has been prejudiced by any pretrial delay. A court's assessment of prejudice should reflect the "interests of defendants which the speedy trial right was designed to protect."[99] The "reasonable diligence" inquiry and the length of the delay are relevant to the prejudice analysis.[100] As the Court has concluded that the government exercised reasonable diligence in finding Defendant, the burden is on Defendant "to show specific prejudice to his defense from the lengthy delay before trial."[101]

---

[97] Gov't Resp. Opp'n [Doc. No. 25] at 14–15.

[98] *Loud Hawk*, 474 U.S. at 314–15.

[99] *Barker*, 407 U.S. at 532.

[100] *See id.* at 175; *Claxton*, 766 F.3d at 296.

[101] *See Velazquez*, 749 F.3d at 184.

Three forms of prejudice are generally associated with pretrial delay: (1) "oppressive pretrial incarceration," (2) "anxiety and concern of the accused," and (3) "the possibility that the [accused's] defense will be impaired by dimming memories and loss of exculpatory evidence."[102] Prejudice to an accused's defense is the most serious form of prejudice, but the most difficult to prove.[103] Here, Defendant was not incarcerated until March 31, 2022, and there is no evidence that Defendant was aware of the sealed federal indictment against him before this date. Therefore, the first two forms of prejudice have no bearing in this case, and the parties' arguments turn on whether Defendant's defense was impaired by the passage of time.

Defendant argues that the delay has prejudiced his ability to prepare a defense by diminishing his memory of the events and making it difficult to investigate possible defenses, locate defense witnesses from the nightclub parking lot where he was initially arrested, or obtain physical evidence such as video surveillance from nearby businesses.[104] Defendant has presented some evidence of prejudice related to dimming memories. Specifically, an investigator for the Federal Community Defender's Office testified that, during the week of May 30, 2022, she contacted Jennifer Silvestre, a witness to Defendant's initial arrest on October 9, 2019.[105] However, the investigator was unable to elicit specific information about Defendant's arrest from Ms. Silvestre, who said that she could not remember the night of Defendant's arrest because it was so long ago.[106]

---

[102] *Barker*, 407 U.S. at 532, *see also Velazquez*, 749 F.3d at 184 n.22  (quoting *Doggett*, 505 U.S. at 654).

[103] *Barker*, 407 U.S. at 532, *see also Velazquez*, 749 F.3d at 175 (citing *Doggett*, 505 U.S. at 655).

[104] Def.'s Mem. L. Supp. Mot. Dismiss [Doc. No. 21] at 8–9.

[105] Tr. June 6, 2022 at 69–71.

[106] Tr. June 6, 2022 at 76.

However, the evidence shows only minimal prejudice. The delay between indictment and trial in this case—21 months—while sufficient to trigger a constitutional inquiry, is significantly shorter than many of the cases in which the Supreme Court and Third Circuit have identified a constitutional speedy trial violation.[107] In fact, the Court cannot find from the testimony presented that any evidence has actually become unavailable to Defendant. Defendant's investigator did not take steps to refresh Ms. Silvestre's recollection, for example, with videos from the night in question, and Defendant did not claim that such steps would be ineffective.[108]

Any prejudice is further mitigated by the fact that Defendant had actual and immediate notice of the need to preserve evidence in connection with the Pennsylvania firearms charges. Defendant knew that he faced criminal charges related to the events of October 9, 2019, even though he did not know until his March 2022 arrest that he would be charged federally. Further, Defendant was represented by counsel who could have assisted him in gathering and preserving relevant evidence.[109] The Court finds that one witness's purported failure to recall Defendant's arrest, when initially questioned, without the ability to refresh her recollection, does not satisfy Defendant's burden of showing specific prejudice to his defense from the pretrial delay. Even if Mrs. Silvestre is unable to recall the events, Defendant has not identified how that would specifically prejudice his defense in light of the other evidence that may be available to him.

---

[107] *See Doggett*, 505 U.S. at 652 (examining an 8 and a half-year delay between indictment and arrest); *Velazquez*, 749 F.3d at 174 (examining a 6 and a half-year delay between indictment and arrest); *Claxton*, 766 F.3d at 297 (finding that although a 19-month delay between indictment and arrest triggered a Sixth Amendment speedy trial inquiry, it did not necessarily "rise to the level of presumptively prejudicial").

[108] Tr. June 6, 2022 at 76.

[109] *See* Gov't Ex. 27 at 3 (Philadelphia County Court of Common Pleas public docket reflecting Defendant's representation by the Defender Association of Philadelphia).

### III.  CONCLUSIONS OF LAW

1. Defendant's Sixth Amendment right to a speedy trial was not violated by the 19-month delay between Defendant's indictment and his arrest.

2. This delay was sufficient to trigger a constitutional inquiry, and Defendant promptly asserted his right to such an inquiry.

3. The government was reasonably diligent in its pursuit of Defendant, especially as Defendant intentionally contributed to the difficulty of apprehending him by living under a false name and being on the run after posting bail at the time he was indicted on his federal charges.

4. Defendant has not met his burden of demonstrating prejudice from the delay between his indictment and his arrest.

### IV.  CONCLUSION

For the foregoing reasons, and based on the foregoing findings of fact and conclusions of law, Defendants' Motion to Dismiss the Indictment on Constitutional Speedy Trial Grounds is denied. An order will be entered.